UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| CARL CAMPBELL, | 4:16-CV-04030-KES |
| Movant, | |
| vs. | REPORT AND RECOMMENDATION |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

## INTRODUCTION

This matter is before the court on movant Carl Campbell's *pro se* motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255. <u>See</u> Civ. Docket No. 1 and 22.[1] Respondent the United States of America ("government") now moves to dismiss Mr. Campbell's motion without holding an evidentiary hearing. <u>See</u> Civ. Docket No. 30. Mr. Campbell resists the motion. <u>See</u> Civ. Docket No. 35. This matter was referred to this magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, district court judge.

---

[1] The court in this opinion cites to documents found in the docket of this, Mr. Campbell's civil § 2255 case, as well as his underlying criminal case, <u>United States v. Campbell</u>, 4:12-cr-40039 (DSD). To distinguish between the two cases, this court will cite to "Civ." when citing to documents filed in Mr. Campbell's § 2255 case; the court will cite to "CR" when citing to documents filed in Mr. Campbell's criminal case.

## FACTS

### A.     Pretrial Proceedings

Mr. Campbell was first charged in federal court on April 4, 2012, in a two-count indictment involving an adult victim, M.A.  See CR Docket No. 1.  That original indictment alleged he committed the crimes of sex trafficking by fraud, force and coercion and interstate transportation for prostitution.  Id.   Attorney Jeff Larson was appointed to represent Mr. Campbell and remained his lawyer throughout the district court and court of appeals proceedings.  See CR Docket Entry following Docket No. 9.  Mr. Campbell made his initial appearance on this indictment on June 18, 2012, and was detained for the duration of his federal case.[2]  See CR Docket Nos. 7 & 9.  Trial counsel moved for and received court-appointed paralegal assistance.  See CR Docket No. 16.

Counsel also requested from the government notice of any evidence it intended to introduce at trial concerning other acts under FED. R. EVID. 404(b).  See CR Docket No. 11.  When the government did not give notice of any Rule 404(b) evidence, counsel moved to exclude such evidence at trial.  See CR Docket No. 27.  Counsel's motion also sought exclusion of Mr. Campbell's prior criminal record.  Id.

Subsequent to this motion, the government filed notice of intent to introduce Rule 404(b) evidence at trial.  See CR Docket No. 52.  Specifically, the government gave notice it intended to offer at trial evidence of a pattern of

---

[2] Mr. Campbell did not appear sooner on the federal indictment because, at the time of his indictment, he was in the custody of state authorities in Minnesota and had to be writted out of their custody.  See CR Docket No. 6.

assaults by Mr. Campbell against M.A., specifying four dates on which M.A. reported assaults by Mr. Campbell to the police, but also indicating M.A. may testify to other assaults which had occurred and not been reported to authorities.  Id.  The government also gave notice it intended to introduce testimony from five other adult women, including J.R., who would testify Mr. Campbell recruited or attempted to recruit each of them to perform commercial sex acts for him.  Id.  In addition, the government amended its 404(b) notice to include an intent to offer evidence that Mr. Campbell directed acts of violence toward J.R., an uncharged victim of sex trafficking, in order to coerce her into engaging in prostitution for Mr. Campbell.  See CR Docket No. 71.

Mr. Campbell's trial counsel opposed the introduction of the government's Rule 404(b) evidence arguing the government failed to give adequate pretrial notice, the evidence was not material or relevant to the crimes charged, and the evidence was more prejudicial than probative.  See CR Docket No. 60.

A superseding indictment was issued on July 10, 2012, adding a count alleging sex trafficking of a child victim, N.K., and obstruction of sex trafficking enforcement related to M.A.  See CR Docket No. 21.

Trial counsel moved to suppress on Fourth Amendment grounds all evidence obtained or derived from a search of property authorized by search warrant #12-MC-54.  See CR Docket Nos. 29 & 30.  The search warrant in question allowed the search of nine items which themselves had been seized by

police in Chicago in a warrantless search of Mr. Campbell's hotel room. Id. Counsel argued that no constitutional basis was shown in the search warrant affidavit for the original acquisition of the items in Chicago, that the search warrant lacked specificity, the warrant lacked probable cause because informant(s)' credibility was not established, and the affidavit in support of the search warrant did not specify how many juveniles or domestic assaults were involved. Id.

An evidentiary hearing was held before a magistrate judge, who recommended the motion to suppress be denied. See CR Docket Nos. 34 and 38. Trial counsel objected to the magistrate judge's opinion, thus triggering de novo review by the district court. See CR Docket No. 42. The district court reviewed the suppression motion de novo and came to the same conclusion as the magistrate judge had—the court denied Mr. Campbell's motion to suppress. See CR Docket No. 49.

A second superseding indictment was issued on November 6, 2012, alleging the four previously-asserted counts, as well as a new fifth count alleging attempted sex trafficking of a child, L.O. See CR Docket No. 40.

Prior to trial, Mr. Campbell's counsel filed three motions in limine. One motion sought to exclude expert opinion testimony without first holding a hearing outside the presence of the hearing of the jury to determine reliability of the opinion. See CR Docket No. 53. The second motion sought to prohibit government witnesses from referring to M.A., N.K. or L.O. as a "victim." See CR Docket No. 55. The third motion sought sequestration of government

4

witnesses during trial.  See CR Docket No. 56.  Counsel also filed a motion to compel the government to turn over any exculpatory evidence.  See CR Docket No. 54.

Preparatory to trial, Mr. Campbell's lawyer requested subpoenas for five defense witnesses, all of which the court granted.  See CR Docket Nos. 66 & 67.

At the pretrial conference, the court ruled on the pending Rule 404(b) motions.  See CR Docket No. 127 Pretrial Conference Transcript (PCT) at pp. 25 et seq.  The court ruled that all the incidents of violence between Mr. Campbell and M.A. would be admissible because all the alleged behavior took place during the time periods alleged in the indictment and were evidence of a pattern to cause M.A. to believe that failure to perform a commercial sex act for Mr. Campbell would result in serious physical harm or restraint against M.A. Id. at pp. 25-26.  This was part of the *res gestae* of the crime alleged.  Id. at p. 26.

The court also ruled the 404(b) evidence of Mr. Campbell's assaultive behavior against J.R. would be admissible.  Id. at pp. 26-27.  Mr. Campbell's defense regarding M.A. was that M.A. and Campbell were in a dysfunctional alcohol-fueled relationship and that the relationship, not prostitution, was the cause of Mr. Campbell's assaults.  Id.  J.R. and Mr. Campbell were not in a relationship and did not drink alcohol together, so evidence that Mr. Campbell also assaulted J.R. was admissible to prove motive, intent, and lack of mistake. Id.

As to four of the five 404(b) witnesses—everyone but J.R.—the court granted defense counsel's motion *in limine* prohibiting the government from introducing prostitution-related evidence from these four women because the government's pretrial notice was insufficient.  Id. at p. 38-39.  The government redacted the women's names from its 404(b) notice and never gave Mr. Campbell's counsel an unredacted version of the notice.  Id.  Furthermore, the discovery in the case had been voluminous, so defense counsel could not have known he should prepare for these witnesses.  Id.

As to J.R., the government had provided defense counsel her initials and defense counsel understood to whom those initials referred.  Id. at p. 39.  Therefore, the government's pretrial notice as to J.R.'s 404(b) evidence was sufficient.  Id.  The court further ruled the substance of J.R.'s testimony showed a similar plan, motive and intent on Mr. Campbell's part to the actions he pursued in connection with the victims charged in the indictment.  Id. at pp. 39-40.  Furthermore, Mr. Campbell's actions with J.R. took place in the same time frame as the crimes charged in the indictment.  Id.  For all these reasons, the court ruled J.R.'s 404(b) evidence was admissible.  Id. at pp. 40-41.

The court granted the defense motion *in limine* regarding expert opinion evidence.  Id. at p. 42.  The court also granted the motion *in limine* regarding use of the term "victim" to refer to M.A., L.O., and N.K. during trial.  Id. at pp. 42-43, 46.  The court granted defense counsel's motion to exclude evidence of Mr. Campbell's criminal record.  Id. at pp. 41-42.

6

**B.    Jury Trial**

The jury trial on Mr. Campbell's five-count second superseding indictment began on February 5, 2013.  See CR Docket entry immediately prior to CR Docket No. 86.  The trial concluded on February 8, 2013, with guilty verdicts on each of the five counts.  See CR Docket No. 90.  For reasons that will be made clear below in the DISCUSSION portion of this opinion, only the testimony relative to the conviction involving L.O. is set forth herein.

Generally, testimony in the trial established that commercial sex acts connected to Mr. Campbell were arranged by posting an internet advertisement on Backpage.com.  Exhibits were introduced establishing all Backpage ads which were created in association with Mr. Campbell's email address.[3]  See Trial Exhibit Nos. 7, 7.1 through 7.15, 8, 8.1, 8.2, 9, 9.1 through 9.3, 10, 11, 11.1 through 11.4, 12 and 13.  Another exhibit was introduced establishing all Backpage charges to Mr. Campbell's Netspend card used to pay for the ads. See Trial Exhibit No. 6.

The normal procedure for arranging a commercial sex act was customers would call or text the phone number listed in the Backpage ad.  Either Mr. Campbell, pretending to be a woman, or a female associate of Mr. Campbell, would answer the phone or respond to the text and set up a meeting at a hotel.  Mr. Campbell rented the hotel rooms and gave the women

---

[3] Mr. Campbell testified that both he and M.A. knew his email account password and that some of the Backpage ads in evidence were posted by M.A., and not by him.  See CR Docket No. 129-2 JT at p. 190.  M.A. also testified she had Mr. Campbell's email address memorized.  See JT CR Docket No. 129-1 at pp. 189-90, 202.

condoms to use. He collected the money afterward, sometimes keeping it all for himself, sometimes apportioning it between himself and the woman. The ads were placed using fake names and often using photographs of other women, not the real photos of the women who were going to perform the commercial sex act.

### 1.    Testimony of L.O.

L.O. testified. See CR Docket No. 129-2, Jury Trial Transcript (JT) at p. 52 et seq.[4] She was born in Sioux City and lived there for 10 years before moving to Sioux Falls where she lived for 5 or 6 years. Id. at 53. Growing up, she spent a good deal of her time in juvenile detention centers and treatment centers. Id. She went to 5 treatment centers, the first one when she was 15 years old. Id. L.O. first met Carl Campbell when she was 15 at a house party in Sioux Falls. Id. at 54. It was summertime, maybe 2010. Id. L.O. went to the party with a 20-year-old who was a daughter of L.O.'s father's girlfriend. Id. at 55. L.O. testified Mr. Campbell talked to her at the party and asked her how old she was. Id. at 56. She testified she told him her real age, 15. Id.

---

[4] The transcript of the jury trial is in four continuously-numbered volumes comprising 667 pages. See CR Docket Nos. 129, 129-1, 129-2, and 129-3. When that transcript was filed in the court's electronic docketing system, CM/ECF, the docketing software assigned its own page numbers. So, for example, Volume I of the jury trial transcript at CR Docket No. 129 bears CM/ECF page numbers 1 through 117. Volume II, filed at CM/ECF 129-1, bears CM/ECF page numbers beginning over again at 1 through 294. Because reviewing courts are most likely to use the CM/ECF system to access the transcript, and because navigating through the transcript is most easily accomplished with reference to the CM/ECF-assigned numbers, this court references the jury trial transcript by citation to the CM/ECF document number and the CM/ECF-assigned page number. These references differ from the actual page numbers of the transcript assigned by the court reporter when the testimony was transcribed.

Asked if she had lied about her age to Mr. Campbell, she denied that.  Id.
When Mr. Campbell found out L.O. was 15, L.O. said he did not want to have
anything to do with her.  Id.

After that first meeting, L.O. went to Custer for a juvenile placement, and
then to the Juvenile Detention Center ("JDC").  Id.  She was released from JDC
in April, 2011, maybe April 11.  Id. at 57.  L.O. went to her friend's house and
Mr. Campbell was there.  Id.  L.O. was 16 years old at this point.  Id.
Mr. Campbell seemed to remember meeting her from before.  Id.  He told her
she looked different; she looked older.  Id.  L.O. testified she did not think she
told Mr. Campbell she was 18.  Id.  Mr. Campbell gave L.O. a ride home,
stopping en route to buy alcohol, which the two of them consumed.  Id. at 58.
L.O. and Mr. Campbell exchanged phone numbers.  Id.

From the time of this second meeting between L.O. and Mr. Campbell,
the two "hung out" together approximately once a week at various hotels.  Id.
A couple of times the topic of prostitution came up.  Id.  Mr. Campbell asked
L.O. to go on "dates" a couple of times for him and she told him "no."  Id. at 59.
Mr. Campbell then asked L.O. if she had any friends.  Id.  L.O. put
Mr. Campbell in touch with an 18-year-old friend of hers who took a
prostitution call for him.  Id.  L.O. rode along.  Id.  Mr. Campbell, the friend,
and L.O. rode to a casino near a hotel.  Id.  Mr. Campbell gave L.O. a condom
to give to her friend before the "date" occurred.  Id. at 62.  The friend walked
into the hotel.  Id. at 59.  Mr. Campbell waited in the casino while the friend
was on the date; L.O. tried to go into the casino with Mr. Campbell but she was

refused because she was not old enough.  <u>Id.</u> at 63.  When the friend emerged from the hotel after the "date," she had approximately $250 in cash, which she gave to L.O.  <u>Id.</u>  L.O. gave some of this money to Mr. Campbell and some to the friend.  <u>Id.</u>  L.O. did not keep any of the money for herself.  <u>Id.</u>

Mr. Campbell also used L.O. to help him answer calls in response to Backpage ads.  <u>Id.</u> at 63-64.  The phone would ring and Mr. Campbell would hand it to L.O.  <u>Id.</u> at 64 (475).  Another thing Mr. Campbell would have L.O. do is keep J.R. (another of Mr. Campbell's prostitutes—not referenced in the indictment), at L.O.'s house so that J.R. would be available for dates set up by Mr. Campbell.  <u>Id.</u>

Finally, a time came when L.O. agreed to perform a commercial sex act for Mr. Campbell.  <u>Id.</u> at 65.  L.O. called Mr. Campbell on May 21, 2011, and said she wanted some money.  <u>Id.</u>  Mr. Campbell picked L.O. up and took her to a hotel; L.O. waited in the car while Mr. Campbell went inside the hotel.  <u>Id.</u> at 66.  When Mr. Campbell came out, the police were there and called Mr. Campbell over to them.  <u>Id.</u> at 67.  The police then took L.O. home.  <u>Id.</u>

On cross-examination of L.O., defense counsel elicited the fact that, when the police took her away from Mr. Campbell on May 21, she never told the police she was involved in an attempted act of prostitution.  <u>Id.</u> at 72.  Also, defense counsel elicited the fact that at the time L.O. had a very serious drug problem.  <u>Id.</u> at 73.  L.O. admitted she had been using methamphetamine, ecstasy, and marijuana during this time frame.  <u>Id.</u>  L.O. said during the time she testified about, she was stoned all the time.  <u>Id.</u>  Defense counsel also

elicited testimony from L.O. that she told police she had never performed an act of prostitution for Mr. Campbell; that she had only answered phones and babysat other girls for him.  Id. at 73-74.  L.O. also testified on cross-examination that she never felt pressured by Mr. Campbell to do anything for him.  Id. at 74.

### 2.    Carl Campbell's Testimony

Mr. Campbell testified in his own defense at trial.  See JT at CR Docket 129-2, pp. 184 et seq.  Mr. Campbell testified L.O. "never did nothing sexually as far as prostitution-wise" for him.  Id. at 196, 214.  He admitted meeting L.O. and knowing she was underage.  Id.  He also admitted meeting her again approximately a year later at a party, giving her a ride home, and stopping en route to buy alcohol.  Id. at 196-97, 216.  He denied that he gave any of the alcohol to L.O.  Id. at 216-17.  Mr. Campbell agreed that he and L.O. became "friends."  Id. at 217.

Mr. Campbell admitted having sex with L.O. when L.O. was sixteen and Mr. Campbell was 33.  Id. at 210-11, 216.  Mr. Campbell admitted L.O. told him her age when he first met her; although L.O. testified she said she was 15, Mr. Campbell testified she said 16.  Id. at 209-10.

Mr. Campbell's account of the events of May 21, 2011, were as follows. He testified L.O. called him and asked him what he was doing.  Id. at 197.  He responded that he was not doing anything and offered to pick L.O. up and take her to breakfast.  Id.  After picking L.O. up, Mr. Campbell got a call from a friend of his who asked Mr. Campbell to come pick him up at a hotel.  Id.

11

When Mr. Campbell arrived at the hotel with L.O. in his car, he spied the

police.  Id.  He had no driver's license, so he got out of the car.  Id. at 197-98.

Mr. Campbell testified the police asked him about a guy he knew for whom an

arrest warrant was outstanding.  Id. at p. 198.  Mr. Campbell testified he did

nothing else with L.O. at that point.  Id.

### 3.    Defense Counsel's Closing Arguments

In closing arguments, Mr. Campbell's counsel invited the jury to examine

the exhibits of the Backpage advertisements—he told them they would not find

a posting for May 21, 2011, that would corroborate L.O.'s story about an

attempted commercial sex act on that day.  Therefore, counsel argued, the jury

should not believe L.O.  See JT at CR Docket No. 129-3 at pp. 33-34.

## C.    Sentencing

After resolving Mr. Campbell's objections to the presentence investigation

report (PSR), the court calculated the United States Sentencing Guidelines

(USSG) sentencing range to be life imprisonment for Counts 1, 3 and 5.[5]  See

CR Docket No. 130 Sentencing Transcript (ST) at pp. 56-57.   The sentencing

range for Counts 2 and 4 was the statutory maximum of 20 years.  Id. at p. 56.

Defense counsel advocated for a downward variance from the USSG range.  Id.

at pp. 57-58.

Mr. Campbell personally addressed the court and asserted his innocence.

Id. at p. 63.  He told the court he never induced the victims to engage in

---

[5] Mr. Campbell's adjusted offense level was 48 and he had 28 criminal history
points, placing him in Criminal History Category VI, the highest criminal
history category.  See CR Docket No. 130 ST at pp. 56-57.

prostitution—that they were already engaged in prostitution before he met them.  Id. at p. 66.  He stated he did not know their ages or their family backgrounds.  Id.

The court rejected the request for a downward variance.  Id. at p. 82. The court noted Mr. Campbell's extremely lengthy and violent criminal history, which amassed more than twice the minimum number of criminal history points necessary to place him in the highest USSG criminal history category. Id. at pp. 79-82.  In addition, the court noted that Mr. Campbell had not responded to opportunities to rehabilitate himself in the past.  Id.  Also, the court noted Mr. Campbell's criminal history showed a marked disregard for other people.  Id.  The court concluded that a sentence of life imprisonment on Counts 1, 3, and 5 was appropriate.  Id. at p. 82.  See also CR Docket No. 115.

**D.    Appeal**

Mr. Campbell timely appealed.  He raised the following issues:

1.    The district court made erroneous evidentiary rulings as to:

    a.    admission of photographs;

    b.    admission of motel receipts;

    c.    admission of evidence M.A. and her mother had been abused by M.A.'s father;

    d.    applying the hearsay rules unevenly;

    e.    precluding cross-examination;

    f.    inconsistent application of rule of *res gestae*;

    g.    misapplication of Rule 404(b); and

        h.     failure to balance probative value and prejudice.

2.    District court violated Mr. Campbell's confrontation rights and right to present his defense.

3.    Failure to grant Mr. Campbell's motion to suppress.

4.    Mr. Campbell was denied effective assistance of counsel.

5.    The district court's sentence violated Mr. Campbell's double jeopardy and jury trial rights.

See Appellant's Brief at pp. 2-4, United States v. Campbell, USCA No. 13-2287 (8th Cir. Aug. 7, 2013). The Eighth Circuit affirmed the district court in all respects. See United States v. Campbell, 764 F.3d 880, 893 (8th Cir. 2014).

**E.    Mr. Campbell's Instant Motion**

In his § 2255 motion, Mr. Campbell raises only two grounds for relief, each with many subparts. He argues his Sixth Amendment right to effective assistance of counsel was violated and that his Fifth Amendment due process right was violated. See Civ. Docket No. 1 at p. 5. The subparts of these grounds are elaborated on in Mr. Campbell's accompanying brief and his brief in opposition to the government's motion to dismiss. See Civ. Docket Nos. 1-1, 1-2, 1-3, 1-4 and 35. Again, for reasons more fully explained below, the court addresses only those claims that apply to the conviction associated with L.O. and claims affecting all of his convictions. Those claims are as follows:

### 1. Ineffective Assistance Allegations

Mr. Campbell alleges his lawyer was ineffective for failing to investigate L.O.'s motive to lie and for failing to impeach L.O. at trial.  See Docket No. 1-3 at pp. 5-6.  Mr. Campbell also alleges his lawyer was ineffective for failing to know the substantive law and elements of the offense charged in Count 5, the charge related to L.O.  Id. at p. 7.  Mr. Campbell asserts counsel was ineffective for failing to consult with Mr. Campbell during the direct appeal.  Id.  Finally, Mr. Campbell asserts the cumulative effect of all of counsel's errors combine together to violate his Sixth Amendment right to effective assistance of counsel. Id. at p. 8.

### 2. Due Process Allegations

Mr. Campbell alleges his Fifth Amendment due process rights were violated when the government committed prosecutorial misconduct by soliciting perjured testimony from N.K.  See Civ. Docket No. 1-4 at p. 2  He also alleges the investigators in his case violated his due process rights by presenting false and misleading evidence to the courts, improperly investigating, and improperly interviewing witnesses.  Id. at p. 3.

### 3. Equal Protection Allegation

Finally, Mr. Campbell moved to amend or supplement his original motion by adding a claim that the prosecutor violated his Fifth Amendment equal protection rights by striking all African-American jurors from the panel.  See Docket No. 22.

The government has moved to dismiss Mr. Campbell's § 2255 motion without holding an evidentiary hearing.  <u>See</u> Civ. Docket No. 30.  Mr. Campbell resists that motion.

## DISCUSSION

### A.  Mr. Campbell's Motion to Supplement or Amend

The government did not object to Mr. Campbell's motion to add an equal protection claim to his motion.  Both parties addressed the additional claim substantively in the briefing on the government's motion to dismiss. Accordingly, the court grants Mr. Campbell's motion to amend his motion by adding this additional claim.

### B.  General Scope of § 2255 Motions

Section 2255 of Title 28 of the United States Code was enacted to supersede habeas corpus practice for federal prisoners.  <u>Davis v. United States</u>, 417 U.S. 333, 343-44 (1974).  Prior to the enactment of § 2255, habeas claims had to be brought in the district where the prisoner was confined, resulting in overburdening those districts where federal correctional institutions were located and presented logistical issues because the record in the underlying criminal case were often in a distant location.  <u>United States v. Hayman</u>, 342 U.S. 205, 212-16 (1952).  The enactment of § 2255 resolved these issues by requiring that the motion be filed in the sentencing court.  <u>Id.</u>

The scope of a § 2255 motion is seemingly broader than the scope of a habeas petition, the latter of which is typically limited to allegations of a constitutional dimension.  Section 2255 allows a federal prisoner to "vacate, set

aside or correct" a federal sentence on the ground that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." See 28 U.S.C. § 2255. Where the allegation for relief is *not* based on a violation of a Constitutional or federal statutory right or an assertion that the court was without jurisdiction, the Supreme Court has read a "fundamentality" requirement into § 2255. Relief is available for only those errors which constitute a "fundamental defect which inherently results in a complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair procedure." Hill v. United States, 368 U.S. 424, 428 (1962); see Peguero v. United States, 526 U.S. 23, 27-30 (1999).

Generally, petitioners are precluded from asserting claims pursuant to § 2255 that they failed to raise on direct appeal. United States v. Frady, 456 U.S. 152, 167-68 (1982); McNeal v. United States, 249 F.3d 747, 749 (8th Cir. 2001). When a § 2255 petitioner asserts a claim that is procedurally defaulted because it was not raised on direct appeal, the claim can only proceed after the petitioner has shown either: (1) actual innocence or (2) that the procedural default should be excused because there was both cause for the default and actual prejudice to the petitioner. Bousley v. United States, 523 U.S. 614, 621-22 (1998); McNeal, 249 F.3d at 749. Therefore, barring a claim of actual innocence, a petitioner must show both cause for why he failed to raise an issue on direct appeal as well as actual prejudice caused by the alleged errors.

Appellate courts generally refuse to review claims of ineffective assistance of counsel on direct appeal; such claims are, therefore, properly addressed in a 28 U.S.C. § 2255 motion such as the one here.  See Campbell, 764 F.3d at 892-93; United States v. Lee, 374 F.3d 637, 654 (8th Cir. 2004) (ineffective assistance of counsel claims are not generally cognizable on direct appeal and will be heard only to prevent a miscarriage of justice or in cases where the district court has developed a record on the issue).  Therefore, no procedural default analysis is required before examining petitioner's claims of constitutionally-deficient counsel.

## C.    **Batson Claim**

Mr. Campbell is African-American.  He claims the government lawyer struck all African-American prospective jurors from his jury in violation of Batson v. Kentucky, 476 U.S. 79 (1986).  This claim was not raised on direct appeal by Mr. Campbell.

### 1.    **The Batson Claim is Procedurally Defaulted**

As stated above, petitioners generally are precluded from asserting claims pursuant to § 2255 that they failed to raise on direct appeal.  Frady, 456 U.S. at 167-68; McNeal, 249 F.3d at 749.  When a § 2255 petitioner asserts a claim that is procedurally defaulted because it was not raised on direct appeal, the claim can only proceed after the petitioner has shown either actual innocence or that the procedural default should be excused because there was both cause for the default and prejudice to the petitioner.  McNeal, 249 F.3d at 749.  Therefore, Mr. Campbell must show both cause for why he

failed to raise these issues on direct appeal as well as actual prejudice caused by these errors.

Mr. Campbell does allege a claim of ineffective assistance of counsel, arguing that his counsel should have consulted with him during the direct appeal briefing.  Reading Mr. Campbell's pleadings with the required leniency due a *pro se* litigant, the court might consider this an assertion of "cause" excusing his procedural default.  However, in connection with his failure-to-consult-on-appeal claim, the only issues Mr. Campbell indicates he wanted counsel to raise were claims of ineffective assistance of counsel.  Counsel, despite being the same counsel as at the district court level, in fact raised these issues on himself on appeal.

Even if the court considers Mr. Campbell's failure-to-consult-on-appeal claim to be an assertion of "cause," Mr. Campbell does not fulfill his burden of demonstrating prejudice.  This conclusion requires examining the merits of a <u>Batson</u> claim.

### 2.    The <u>**Batson**</u> Claim Fails on its Merits

In <u>Batson</u>, James Batson, an African-American man, was convicted in Kentucky on charges of second degree burglary and receipt of stolen goods. <u>Batson</u>, 476 U.S. at 82.  During jury selection, the prosecutor used his peremptory strikes to strike all four of the black people on the jury panel, leaving only white people on Mr. Batson's jury.  <u>Id.</u> at 83.  Defense counsel moved to discharge the jury before it was sworn, arguing the prosecutor's actions violated Mr. Batson's equal protection rights.  <u>Id.</u>  The trial court denied

the motion and the all-white jury convicted Mr. Batson.  The Kentucky Supreme Court affirmed the conviction.  Id. at 84.  Mr. Batson appealed to the United States Supreme Court.

The Court began by clarifying that "the component of the jury selection process at issue here, the State's privilege to strike individual jurors through peremptory challenges, is subject to the commands of the Equal Protection Clause."  Id. at 89.  Though a prosecutor normally is allowed to exercise peremptory strikes for any reason at all, the Equal Protection Clause forbids the prosecutor from challenging jurors "solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."  Id.

The Batson court enunciated the following framework to determine whether a prosecutor exercises peremptory strikes in violation of the Equal Protection clause:  first, the defendant must make a *prima facie* showing that a peremptory challenge has been exercised on the basis of race.  Batson, 476 U.S. at 93-94; Miller-El v. Dretke, 545 U.S. 231, 238-39 (2005).  The defendant may do this by reference to the totality of relevant facts, including that he is a member of a racial group being singled out for different treatment, and that that the prosecutor exercised peremptory strikes to remove from the jury members of the defendant's race.  Batson, 476 U.S. at 96.  The defendant may also, if applicable, show that the prosecutor has engaged in a pattern of strikes against this racial group, or the prosecutor's questions and statements during voir dire may support or refute a showing of discrimination.   Id. at 97.

20

If the defendant makes a *prima facie* showing, the burden shifts to the state to produce a neutral explanation for the peremptory challenge.  Id.; Miller-El, 545 U.S. at 239.  "Although there may be any number of bases on which a prosecutor might believe that it is desirable to strike a juror who is not excusable for cause . . . the prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenge."  Miller-El, 545 U.S. at 239 (citing Batson, 476 U.S. at 98, n. 20).

Finally, the trial court then must decide whether the defendant has established purposeful discrimination.  Batson, 476 U.S. at 98; Miller-El, 545 U.S. at 239.

> At this stage, 'implausible or fantastic justifications may . . . be found to be pretexts for purposeful discrimination.'  In that instance the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable or improbable the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.

Miller-El v. Cockrell, 537 U.S. 322, 339 (2003) (citation omitted).

An examination of the record in Mr. Campbell's underlying criminal matter reveals that 36 prospective jurors were called for potential service on Mr. Campbell's trial jury.  See CR Docket No. 80.  Examining the juror questionnaires for those 36 prospective jurors (which questionnaires are attached hereto under seal for reviewing courts to examine), 35 of the prospective jurors identified themselves as "white."  See Appendix attached hereto.  One prospective juror identified him/herself as Pakistani.  Id.  The

Pakistani juror was not struck, but served on the jury as an alternate.[6]  See CR Docket No. 80.  The other jurors who were struck, by both government counsel and defense counsel, were all white.  No <u>Batson</u> violation occurred because government counsel never struck any African-American jurors from the panel— there never were any African-American potential jurors.  Hence, Mr. Campbell has failed to show any prejudice as a result of his counsel's failure to raise a <u>Batson</u> challenge on appeal—such a claim would have been wholly without merit.  Having failed to demonstrate cause and prejudice on this procedurally defaulted claim, the court recommends no habeas relief be granted on Mr. Campbell's <u>Batson</u> claim.

## D.    Due Process Claims

Mr. Campbell asserts two due process claims.  He claims his due process rights were violated when the government committed prosecutorial misconduct by introducing perjured testimony from N.K. at trial and his lawyer failed to object to the admission of said evidence.  Mr. Campbell's second due process allegation is that government investigators coerced N.K. into lying to incriminate him.  Neither one of these claims were raised in Mr. Campbell's direct appeal.

As stated above, petitioners generally are precluded from asserting claims pursuant to § 2255 that they failed to raise on direct appeal.  <u>Frady</u>, 456 U.S. at 167-68; <u>McNeal</u>, 249 F.3d at 749.  When a § 2255 petitioner asserts a claim that is procedurally defaulted because it was not raised on

---

[6] The juror of Pakistani descent was excused before the jury retired to deliberate because that juror was an alternate.  <u>See</u> Docket No. 129-3 at p. 44.

direct appeal, the claim can only proceed after the petitioner has shown either actual innocence or that the procedural default should be excused because there was both cause for the default and prejudice to the petitioner.  McNeal, 249 F.3d at 749.  Therefore, Mr. Campbell must show both cause for why he failed to raise these issues on direct appeal as well as actual prejudice caused by these errors.

Mr. Campbell does allege a claim of ineffective assistance of counsel, arguing that his counsel should have consulted with him during the direct appeal briefing.  Reading Mr. Campbell's pleadings with the required leniency due a *pro se* litigant, the court might consider this an assertion of "cause" excusing his procedural default.  However, in connection with his failure-to-consult-on-appeal claim, the only issues Mr. Campbell indicates he wanted counsel to raise were claims of ineffective assistance of counsel.  Counsel, despite being the same counsel as at the district court level, in fact raised these issues on himself on appeal.

Even if the court considers Mr. Campbell's failure-to-consult-on-appeal claim to be an assertion of "cause," Mr. Campbell does not fulfill his burden of demonstrating prejudice.  Prosecutorial misconduct is not generally a ground for federal habeas relief.  Stringer v. Hedgepeth, 280 F.3d 826, 829 (8th Cir. 2002).  Habeas relief on a claim of prosecutorial misconduct requires showing: (1) that misconduct in fact occurred, and (2) that the misconduct prejudicially affected the defendant's substantial rights by depriving the defendant of a fair trial.  Graves v. Ault, 614 F.3d 501, 507 (8th Cir. 2010).  Here, Mr. Campbell

has not shown any misconduct on the part of government lawyers.  The mere fact that N.K. had given inconsistent statements over time as to whether she told Mr. Campbell her real age does not mean that her trial testimony was perjured or that the government knowingly offered perjured testimony. Mr. Campbell himself testified at trial that he drove N.K. to a truck stop, she disappeared for a short time, then reappeared with money, giving some of it to Mr. Campbell, whereupon he drove N.K. back home.  See JT at CR Docket No 129-2 at p. 210.

Likewise, Mr. Campbell does not offer any facts in support of his allegation that investigators coerced N.K. to lie other than the mere fact she gave inconsistent statements.  N.K. herself acknowledged lying to defense counsel when she agreed to speak to defense counsel and his investigator prior to the trial.  See JT at CR Docket No. 129-2 at p. 94.  N.K. also explained in her trial testimony why she did not at first implicate Mr. Campbell when speaking to investigators—because she was concerned for her safety.  Id. at pp. 86-87. On cross-examination she again readily admitted she had previously given statements to the police that were inconsistent with her trial testimony.  Id. at p. 93.  The mere fact that N.K.'s trial testimony was different from her out-of-court statements does not mean her trial testimony was false.  She adequately explained the difference.

Mr. Campbell's due process claims are procedurally defaulted.  He has failed to establish cause and prejudice to excuse that default.  The court recommends this claim for habeas relief be denied.

### E.    Ineffective Assistance of Counsel Claims

Unlike the above-discussed <u>Batson</u> and due process claims, claims of ineffective assistance of counsel are generally not heard on direct appeal. <u>Campbell</u>, 764 F.3d at 892-93; <u>Lee</u>, 374 F.3d at 654.  Therefore, ineffective assistance claims can permissibly be raised for the first time in a § 2255 motion.  Although counsel, at Mr. Campbell's insistence, in fact raised some of his ineffective assistance claims in his direct appeal, the Eighth Circuit declined to rule on those claims, deferring them to this § 2255 action. <u>Campbell</u>, 764 F.3d at 892-93.

The Sixth Amendment of the Constitution of the United States affords a criminal defendant with the right to assistance of counsel.  U.S. Const. amend. VI.  The Supreme Court "has recognized that 'the right to counsel is the right to effective assistance of counsel.' " <u>Strickland v. Washington</u>, 466 U.S. 668, 698 (1984) (citing <u>McMann v. Richardson</u>, 397 U.S. 759, 771, n.14 (1970)). <u>Strickland</u> is the benchmark case for determining if counsel's assistance was so defective as to violate a criminal defendant's Sixth Amendment rights and require reversal of a conviction.  <u>Id.</u> at 687.  "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." <u>Id.</u> at 687-688.  The defendant must also show that counsel's unreasonable errors or deficiencies prejudiced the defense and affected the judgment.  <u>Id.</u> at 691.  The defendant must show, "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable

25

doubt respecting guilt." Id. at 695.  In sum, a defendant must satisfy the

following two-prong test.  Id. at 687.

> First, the defendant must show that counsel's performance was
> deficient.  This requires showing that counsel made errors so
> serious that counsel was not functioning as the "counsel"
> guaranteed the defendant by the Sixth Amendment.  Second, the
> defendant must show that the deficient performance prejudiced the
> defense.  This requires showing that counsel's errors were so
> serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable.  Unless a defendant makes both showings, it
> cannot be said that the conviction or death sentence resulted from
> a breakdown in the adversary process that renders the result
> unreliable.

Id.

"There is a presumption that any challenged action was sound trial

strategy and that counsel rendered adequate assistance and made all

significant decisions in the exercise of professional judgment." Hall v.

Luebbers, 296 F.3d 685, 692 (8th Cir. 2002).  It is the petitioner's burden to

overcome this presumption, and a "petitioner cannot build a showing of

prejudice on a series of errors, none of which would by itself meet the prejudice

test." Id.  Counsel's conduct must be judged by the standards for legal

representation which existed at the time of the representation, not by

standards promulgated after the representation.  Bobby v. Van Hook, 558 U.S.

4, 7-9 (2009).  American Bar Association standards and similar directives to

lawyers are only guides as to what reasonableness of counsel's conduct is, they

are not its definitive definition.  Id.  The Supreme Court distinguishes between

those cases in which the new evidence "would barely have altered the

sentencing profile presented to the sentencing judge," and those that would

have had a reasonable probability of changing the result.  Porter v. McCollum,

558 U.S. 30, 41 (2009).  In assessing the prejudice prong, it is important for courts to consider "the totality of the available mitigation evidence 'both that adduced at trial, and the evidence adduced in the habeas proceeding' " and "reweigh it against the evidence in aggravation."  Id. at 40-41.  It is not necessary for the petitioner to show "that counsel's deficient conduct more likely than not altered the outcome" of his case, only that there is "a probability sufficient to undermine confidence in [that] outcome."  Id. at 44.  Judicial scrutiny of attorney performance is highly deferential, with a strong presumption that counsel's conduct falls within the range of reasonable professional conduct.  Strickland, 466 U.S. at 698.

### 1.    Claims Involving the L.O. Conviction

#### a.    Failure to Investigate L.O.'s Motive to Lie

In Mr. Campbell's § 2255 motion, he asserts two claims of ineffective assistance which are unique to the conviction involving L.O.  First, he claims counsel failed to investigate L.O.'s motives behind her inconsistent statements. See Docket No. 1 at p. 5; Docket No. 1-3 at pp. 5-6.  He cryptically states "L.O. was locked on probation violation and other crimes in J.D.C. and being interviewed L.O. had a pental [sic] interest when being question [sic] by agent's. [sic]"  See Docket No. 1-3 at pp. 5-6.  It seems that Mr. Campbell is suggesting that L.O. lied in order to receive favorable treatment on entanglements she had with the juvenile justice system.

There is no evidence that L.O.'s state court juvenile proceedings were affected in any way by her cooperation and testimony in Mr. Campbell's federal

criminal proceeding, so the allegation lacks any factual basis.  Furthermore,

L.O. testified at trial that for much of her life she had been in custody or in

treatment, so the jury was made aware of that fact.  See JT at Civ. Docket No.

129-2 at p. 53.  She also testified on cross-examination by defense counsel

that, during the time she had interaction with Mr. Campbell, she was stoned

"all the time" on methamphetamine, ecstasy, and marijuana.  Id. at 73.

Defense counsel also established on cross-examination that L.O. had made

prior inconsistent statements to police.  Id. at 72.  The motive, if any, which

L.O. had to lie during her trial testimony was adequately established by

defense counsel.

### b.    Failure to Impeach L.O.

Mr. Campbell also asserts trial counsel was ineffective for "failing to

object to prejured [sic] testimony and properly impeaching governments [sic]

witnesses."  See Docket No. 1-3 at p. 7.  Although unclear in Mr. Campbell's

§ 2255 motion and accompanying memorandum, he clarifies in his brief in

opposition to the government's motion to dismiss that at least part of this claim

involves L.O.  Mr. Campbell elaborates:

> L.O. had testified that Campbell on May 20, 2011 had come to pick
> her up for an allege [sic] commercial sex act (JTT p. 433-34).  But
> in a February 3, 2011 interview L.O. had stated that she never
> prostitute [sic] for Campbell.  Says she is telling the truth and that
> she is not scared or afraid.
>
> On July 27, 2012, in another interview L.O. stated that Campbell
> never ask [sic] her to prostitute.  Counsel never submitted a
> redacted version to the jury or edited video of the interview.  When
> L.O. was question as to prostitution with Campbell when asked if
> Campbell ever showed you how to post ads on Backpage L.O.
> response was no.

See Docket No. 35 at pp. 49-50.

In fact all of this information about L.O. that Mr. Campbell says should have been introduced at trial was introduced.  The government itself introduced evidence that L.O. had been in trouble with the law repeatedly and had been to drug treatment five times.  See JT at Docket No. 129-2 at p. 53. The government itself introduced evidence that L.O. never performed an act of prostitution at Mr. Campbell's request.  Id. at p. 59.  In addition, on cross-examination, Mr. Campbell's counsel elicited testimony that L.O. had been "stoned" all the time during the relevant time she was testifying about, taking methamphetamine, ecstasy, and marijuana.  Id. at p. 73.  Defense counsel elicited testimony from L.O. that Mr. Campbell never pressured her to do anything.  Id. at 74.

Mr. Campbell faults counsel for failing to impeach L.O. with prior inconsistent statements.  He alleges L.O. told police during a videotaped interview on February 3, 2011, that she never performed an act of prostitution for Mr. Campbell.  See Docket No. 35 at pp. 49-50.  Her testimony at trial was consistent with that statement—there was no "impeachment" to be had.  A witness can be "impeached" with a prior statement if that prior statement is different from the testimony she gives in court.  Here, L.O.'s prior statement— that she never prostituted for Campbell—was the same as her in-court statement.

L.O. did testify that Mr. Campbell attempted to have her prostitute for him on May 21, 2011.  See JT Civ. Docket No. 129-2 at pp. 65-67.  The court

notes that the police interview took place in February; the attempted act of prostitution took place three months later on May 21, 2011. Therefore, at the time of the February interview, L.O. *had never* agreed at that point to perform a commercial sex act for Mr. Campbell. At trial L.O. testified that prior to May 21, 2011, she refused all entreaties by Mr. Campbell to engage in sex acts for him. See JT at Docket No. 129-2 at pp. 59, 73-74. She also agreed that this is what she told the police when she gave them a statement in February. Id. at pp. 73-74. That statement was true as of February, 2011, and L.O. testified consistently with this statement at trial.

Mr. Campbell alleges a second law enforcement interview with L.O. was conducted on July 27, 2012. See Civ. Docket No. 35 at pp. 49-50. Although Mr. Campbell provided numerous other discovery documents from the criminal matter, he never provided a document reflecting a July 27, 2012, interview with L.O. In her trial testimony, L.O. did not specifically reference an interview with law enforcement on July 27, 2012. The government's case agent also did not specifically discuss a July 27, 2012, interview with L.O. at trial. The court is left to guess what the contents of that interview were. Mr. Campbell alleges in that interview L.O. told police that he had never *asked* her to prostitute for him and never showed L.O. how to create and post a Backpage ad. Mr. Campbell alleges counsel should have submitted a redacted version of the prior videotaped interviews with L.O. to discredit her trial testimony. See Docket No. 35 at pp. 49-50.

As to the February interview with police, that interview took place *before* the date upon which L.O. agreed to perform a sex act for Mr. Campbell, so her statement to the police at that time was true. It was not necessary to introduce a video to prove L.O. said this on a former occasion when she testified to the same information at trial and also agreed that she had previously told police this. Id.

As to the July 27, 2012, interview, even if the court assumes what Mr. Campbell says L.O. said in that interview is accurate, it was not inconsistent with her trial testimony. L.O. allegedly told the police on July 27, 2012, that Mr. Campbell never *asked* her to perform a commercial sex act. Her testimony at trial was consistent with this prior statement to the police—L.O. told the jury *she called Mr. Campbell* and initiated the request that ultimately led to an attempted commercial sex act. See JT CR Docket No. 129-2 at pp. 65-66. Specifically, L.O. testified as follows:

> L.O:  I called him and said that I wanted money. I was just going to go hang out with him. He came and picked me up. He went to a hotel. I didn't really know what he was doing. I just waited in the car.
>
> Prosecutor: It was your understanding that you were going to perform a commercial sex act. Right?
>
> L.O.:  No.
>
>       ---------
>
> Prosecutor: What was your understanding as to how you were going to get money by calling Carl Campbell?
>
> L.O.:  Yeah, prostitution.

See JT CR Docket No. 129-2 at pp. 65-66.  Therefore, even if L.O. previously

told police that Mr. Campbell never *asked her* to perform a commercial sex act,

her trial testimony was consistent with this prior statement because her trial

testimony was that the commercial sex act was *her idea initiated at her request.*

There is no prejudice to Mr. Campbell because the prior July 27, 2012,

statement by L.O. to the police was not impeaching.

Finally, with regard to L.O., Mr. Campbell alleges counsel should have

introduced the Backpage advertisements for May 21, 2011, to show that L.O.

was never advertised there for the supposed "date" at the hotel to which

Mr. Campbell drove her.  First, this would have made little difference to the

jury's evaluation of L.O.'s testimony.  L.O.'s testimony was she called

Mr. Campbell on May 21, 2011, and told him she wanted money, he picked her

up, drove her to a hotel, and went into the hotel.  Id. at 65-67.  The police

interrupted the sequence of events when they made contact with Mr. Campbell

as he came out of the hotel.  Id.  Whether there was a Backpage ad that day for

L.O. or not, the evidence was overwhelming as to what Mr. Campbell was

planning that day.

Second, the fact that no Backpage ad was posted for L.O. was proven

already—by the government.  The government introduced a series of exhibits

depicting all Backpage ads associated with Mr. Campbell's email address.  See

Trial Exhibits 7, 7.1, 7.2, 7.3, 7.4, 7.5, 7.6, 7.7, 7.8, 7.9, 7.10, 7.11, 7.12, 7.13,

7.14, 7.15, 8, 8.1, 8.2, 9, 9.1, 9.2, 9.3, 10, 11, 11.1, 11.2, 11.3, 11.4, 12, and

13.  These ads covered the period from March 17, 2010, to July 12, 2011.  See

Exhibits 7.4, 7.5, 7.10, 7.13 & 11.4. There was no ad for May 21, 2011. The

only ads close in time to May 21 were an ad posted on May 18, 2011, see

Exhibit 7.2, and one posted on May 27, 2011, see Exhibit 7.3. The government

also proved there was no Backpage ad for L.O. on May 21, 2011, when it

introduced billing records for Mr. Campbell's Netspend card, the financial

instrument used by Mr. Campbell to pay for all his Backpage ads. See Exhibit

6. That exhibit also clearly established there were no charges to

Mr. Campbell's Netspend card from Backpage on May 21, 2011. See id. at p. 6.

The fact that there was no Backpage ad posted for L.O., and no ad dated

May 21, 2011, was a fact emphasized by defense counsel in closing arguments.

See JT Docket No. 129-3 at pp. 33-34. Counsel argued:

> Count 5, L.O. . . . Are we going to base the decision on the
> more important affairs of life on the testimony of L.O.? She said
> she's stoned for the whole time. Remember the part of Preliminary
> Instruction No. 6, the drug use or addiction as a credibility factor.
> The other thing that's said that's interesting is we know how
> these postings apparently happened. At least what I gathered from
> what we heard here is you post an ad, and then you drive to a
> motel room, wait for the phone to ring, wait for the johns to call,
> and then it's there.
> Don't take my word for it, because this isn't in evidence. But
> look through every posting in Exhibits 7 through 13, and I don't
> think you will see a single posting from May 21, the time she is
> pulled over, which then a few stories later, after not telling the
> police anything about it or her probation agent anything about it,
> becomes "He was taking me to a hotel for prostitution." Where is
> the posting?

Id.

Mr. Campbell cannot prove Strickland ineffective assistance on this

claim. The documents he claims should have been admitted into evidence were

admitted, just by government counsel instead of defense counsel; also, the fact

that no Backpage ad for May 21, 2011, existed was more than adequately pointed out by defense counsel.

The court notes that, in any case, little is proved by the fact that a Backpage ad was not created for May 21, 2011, using Mr. Campbell's email address. As the testimony at trial showed, a Backpage ad from a previous day would continue to be displayed on Backpage, it would just appear further down the queue instead of at the top of the search results. See JT at Civ. Docket No. 129-2 at pp. 113-14. Furthermore, there was testimony at trial that the ads rarely used the real woman's photograph and never her real name. See JT at Docket 129-2, pp 168-75. Instead, photographs were found on the internet to be used in the ads and pseudonyms were used. Id. Therefore, the fact that there was not an ad with L.O.'s photo, L.O.'s name, or the date of May 21, 2011, is inconsequential.

The court notes that as to L.O., Mr. Campbell was charged with *attempting* to engage in sex trafficking of a minor, not with completing such a transaction. The attempt was interrupted by the appearance of the police. The jury could have inferred that Mr. Campbell's next step, had he not been interrupted, would have been to post an ad for L.O. on Backpage. As the district court's jury instructions set forth, an attempt to commit the crime of sex trafficking a minor occurred if Mr. Campbell intended to commit the crime of sex trafficking a minor, L.O., and voluntarily, knowingly, and intentionally carried out some act that was a substantial step toward that offense. See CR Docket No. 88 at p. 12. Answering L.O.'s phone call asking for money, picking

34

L.O. up in his vehicle, and driving L.O. to a hotel were all substantial steps toward committing the offense.  Furthermore, Mr. Campbell admitted at trial that he knew L.O. was under the age of 18.  See JT at Docket 129-2 at p. 210.

### c.     Failure to Know the Substantive Law as to Count 5

Mr. Campbell alleges his trial counsel was ineffective for failing to know the substantive law and elements applicable to Count 5, the count of conviction relative to L.O.  On January 28, 2013, eight days before Mr. Campbell's trial began, defense counsel submitted to the trial court proposed jury instructions.  See CR Docket No. 70.  Those instructions included a proposed instruction for sex trafficking of a child, the crime charged in Count 5 of the second superseding indictment involving L.O.  Id. at p. 15.  Defense counsel's instruction set forth the elements of the crime accurately.  Id.; 18 U.S.C. §§ 1591(a)(1), 1594.  The final jury instruction given by the trial court to the jury included those same exact elements as were contained in defense counsel's proposed jury instruction.  Compare CR Docket No. 88 at pp. 1-13, with CR Docket No. 70 at p. 15.  Both instructions accurately set forth the required elements of the crime as well as the requirements for proving an attempt to commit the crime.  Compare CR Docket No. 88 at pp. 1-13, with CR Docket No. 70 at p. 15.  This clearly shows defense counsel was aware of the elements of the crime of sex trafficking of a child as charged in Count 5.

Mr. Campbell asserts that his lawyer was not aware of a key case, United States v. Elbert, 561 F.3d 771 (8th Cir. 2009).  Counsel readily admits he was

35

not aware of the Elbert case.[7]  See Civ. Docket No. 17, at pp. 1-2, ¶ 2 (affidavit of defense counsel).  The transcript from the trial also reveals government counsel was equally unaware of the precise case of Elbert.  See JT CR Docket No. 129-1 at pp. 13-14 (government counsel stating he had a "vague recollection there was law in the Eighth Circuit" about the application of FED. R. EVID. 412 to a sex trafficking case).

However, the Elbert case did not affect the conviction regarding L.O.  The Elbert case involved the application of the so-called "rape shield law," FED. R. EVID. 412, in a case of sex trafficking of a child.  Elbert, 561 F.3d at 773.  Rule 412 provides in pertinent part as follows:

> **(a) Prohibited uses.**  The following evidence is not admissible in a civil or criminal proceeding involving alleged sexual misconduct:
>> (1) evidence offered to prove that a victim engaged in other sexual behavior; or
>> (2) evidence offered to prove a victim's sexual predisposition.
>
> **(b) Exceptions.**
>> **(1) Criminal cases.**  The court may admit the following evidence in a criminal case:
>>> (A) evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence;
>>> (B) evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent or if offered by the prosecutor; and
>>> (C) evidence whose exclusion would violate the defendant's constitutional rights.

See FED. R. EVID. 412(a) and (b)(1).

---

[7] Defense counsel did not overlook Rule 412, discussed and applied in Elbert, but concluded it was inapplicable to Mr. Campbell's case because Mr. Campbell was not charged with rape.  See JT CR Docket No. 129-1 at pp. 12-13.

The <u>Elbert</u> court held that Rule 412 prohibited the defendant in that case from introducing evidence his child victims had engaged in other acts of prostitution.  <u>Elbert</u>, 561 F.3d at 776-78.

As Mr. Campbell acknowledges multiple times in his filings in his § 2255 case, the <u>Elbert</u> case had direct application to the crime alleged with regard to N.K., Count 3.  There was evidence that N.K. had been involved in prostitution prior to the time she met Mr. Campbell, and that she continued prostituting after her connection with Mr. Campbell was severed--evidence defense counsel sought to introduce at trial.  <u>See</u> JT CR Docket No. 129 at pp. 25-26 (defense counsel's opening statement).  Mid-trial when the government raised the <u>Elbert</u> issue, the trial court ruled the <u>Elbert</u> decision precluded the introduction of such evidence as to N.K.  <u>See</u> JT CR Docket No. 129-1 at pp. 15-16.  Because defense counsel had already announced in opening statements that the evidence would show N.K. had engaged in other prostitution, Mr. Campbell argues he was prejudiced because (1) his lawyer lost credibility when the promised evidence was never introduced (because of the trial court's ruling) and (2) his lawyer had to adjust his theory of defense in the middle of the trial.

This court expresses no opinion at this point as to whether the <u>Elbert</u> issue prejudiced Mr. Campbell as to the N.K. conviction on Count 3.  What is clear from the record, however, is that the <u>Elbert</u> decision had ***no*** application at all to L.O. or to the conviction involving L.O. on Count 5.  As defense counsel announced in his opening statement, the evidence showed L.O. never actually engaged in an act of prostitution for Mr. Campbell.  <u>See</u> JT CR Docket No. 129

at p. 26.  In fact, that is the exact evidence that *was* introduced at trial—L.O. testified she never prostituted for Mr. Campbell.  See JT CR Docket No. 129-2 at pp. 73-74.  In addition, nowhere in the trial record did this court find any evidence that L.O. had engaged in other acts of prostitution either before or after she met Mr. Campbell.  See CR Docket Nos. 127 (PTC), 129, 129-1, 129-2, 129-3 (JT).  Therefore, since L.O. had no other sexual activity, Rule 412 and the Elbert decision had no application to L.O., and Mr. Campbell was not prejudiced as to the L.O. conviction by his counsel's failure to anticipate the holding in Elbert.

### 2.    Ineffectiveness Claims of General Applicability

In addition to the ineffectiveness claims directly tied to the L.O. conviction, Mr. Campbell alleges two claims of ineffectiveness that have general applicability to his trial:  (1) that counsel failed to consult with Mr. Campbell during the briefing on direct appeal and (2) that the cumulative effect of all counsel's errors combined to prejudice Mr. Campbell and deprive him of a fair trial.

### a.    Failure to Consult During Direct Appeal Briefing

Mr. Campbell alleges counsel was ineffective for failing to consult with him during the briefing of his direct appeal.  However, the only issue he claims counsel should have consulted him about were his ineffective assistance of counsel claims.  First, the record shows that counsel *did* attempt to raise these claims in Mr. Campbell's direct appeal.  Second, such claims are not usually cognizable on direct appeal.  Third, the Eighth Circuit specifically found in

38

Mr. Campbell's case that the ineffectiveness claims would not be heard on appeal.  Mr. Campbell has failed to show deficient performance or prejudice as required by <u>Strickland</u> as to this claim.  Accordingly, the court recommends denying relief on his § 2255 motion on this ground.

### b.    General Ineffectiveness—Cumulative Effect

Mr. Campbell argues that all of defense counsel's errors taken together prejudiced him.  The Eighth Circuit does not aggregate ineffective assistance of counsel claims as a ground for habeas relief.  <u>Middleton v. Roper</u>, 455 F.3d 838, 846-51 (8th Cir. 2006) (finding no deficient performance on any of petitioner's four individual claims of ineffective assistance of counsel, and rejecting argument that the four claims should be considered cumulatively to determine prejudice); <u>Hall</u>, 296 F.3d at 692 (petitioner cannot show prejudice based on cumulation of errors, no one of which was prejudicial by itself); <u>Wainwright v. Lockhart</u>, 80 F.3d 1226, 1233 (8th Cir. 1996) (cumulative effect of counsel's errors not grounds for habeas relief).  This court recommends no relief be granted on Mr. Campbell's § 2255 motion on the grounds cumulative errors prejudiced him.

The court concludes that defense counsel's representation of Mr. Campbell as regards L.O.'s count of conviction was not deficient.  Furthermore, even if one were to assume counsel's performance was somehow lacking, Mr. Campbell has not shown that he was prejudiced.  The court recommends that no relief be granted on Mr. Campbell's § 2255 motion

concerning the conviction related to L.O. for which he received a sentence of life imprisonment.

### 2.    Concurrent Sentence Doctrine

The court has found no ground for relief applicable to the L.O. count of conviction and no ground for relief applicable generally to Mr. Campbell's trial. The conclusion this court reaches is that neither the L.O.-specific claims, nor the claims of general applicability, entitle Mr. Campbell to relief under § 2255. The court now explains why that conclusion should serve to preclude consideration of the multitude of other claims Mr. Campbell has asserted with regard to the convictions involving M.A. and N.K.

Federal courts are courts of limited jurisdiction:  they may only hear those cases over which Congress or the constitution grants them jurisdiction. Even if the parties do not raise an issue of subject matter jurisdiction, the court must—at all times—ensure that it has jurisdiction.  To that end, the court may at any stage of litigation raise a jurisdictional question *sua sponte*.

Article III of the Constitution grants federal courts jurisdiction over cases and controversies.  See U.S. Const. Art. III, § 2.  The case or controversy requirement means that "the parties must continue to have a 'personal stake in the outcome' of the lawsuit."  Spencer v. Kemna, 523 U.S. 1, 7 (1998) (quoting Lewis v. Continental Bank Corp., 494 U.S. 472, 477-78 (1990)).  "This means that, throughout the litigation, the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.' "  Spencer, 523 U.S. at 7 (quoting

40

Lewis, 494 U.S. at 477).  The usual rule is that, even if a prisoner is released from prison, his habeas petition still presents a "case or controversy" if there is a collateral consequence of the conviction--a "concrete and continuing injury" other than incarceration.  Id.  If there is no collateral consequence, then release from prison renders a prisoner's habeas petition moot.  Id.

In United States v. Neff, 525 F.2d 361, 363 (8th Cir. 1975), Neff brought a § 2255 motion alleging, *inter alia*, that the district court had impermissibly amended his indictment as to count I without resubmitting the matter to the grand jury.  Neff had been convicted of four other counts at trial and, at sentencing, had been given five-year sentences on each of the five convictions, all such sentences to run concurrently.  Id. at 362.  The Eighth Circuit pointed out that, even if Neff succeeded on his improper-indictment-amendment allegation as to count I, his convictions and sentences on the other four counts would remain valid and in full force and effect.  Id. at 363.  The court stated when a habeas petitioner is serving concurrent sentences on multiple counts and can challenge only one count, the challenge would not be considered absent a showing of prejudice.  Id.  Accordingly, the court rejected Neff's § 2255 claim.  Id.  This holding is what is known as the "concurrent sentence doctrine."

In In re Williams, 826 F.3d 1351, 1352-53 (11th Cir. 2016), the court was faced with a second or successive § 2255 Johnson[8] claim as one conviction

---

[8] Johnson v. United States, 576 U.S. ___, 135 S. Ct. 2551 (2015), in which the Supreme Court held unconstitutionally vague the "residual clause" of the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B).

for which Williams received a sentence of life imprisonment; Williams was also serving a second concurrent life sentence for a drug crime under 21 U.S.C. § 841(b)(1)(A). The court held Williams had made a *prima facie* case for the invalidation of one of his life sentences. Id. at 1356. However, because he was also serving a second concurrent life sentence that was not implicated by the holding of Johnson, the court refused Williams permission to file a second § 2255 motion. Id. at 1356-57. Williams could not show any collateral consequences from the invalid conviction nor could he show he would receive any benefit from vacating only one of his convictions. Id.

In Scott v. Louisiana, 934 F.2d 631, 632 (5th Cir. 1991), Scott was serving a life sentence for murder and two 50-year sentences for two convictions for attempted murder, all sentences to run concurrently. In his federal habeas action, he alleged, *inter alia*, that the trial court submitted an erroneous jury instruction on the two attempted murder charges, an allegation the state did not dispute. Id. at 634. The court noted that it had already rejected Scott's habeas challenges to his murder conviction, which conviction and sentence would stand. Id. at 635. Since Scott was serving a life sentence on the murder conviction, the court held there was no possibility Scott would suffer from the attempted murder sentences because they ran concurrently with the life sentence for murder. Id. There were no adverse collateral consequences to Scott as a result of the attempted murder sentences. Id. Because of this, the court refused to rule on the merits of his arguments as to the attempted murder convictions. Id. The court noted there was a possibility

42

Scott might get his life sentence commuted to a term of years and thereby obtain a chance for parole.  Id.  If Scott could demonstrate at some time in the future that the attempted murder charges affected his ability to obtain a commutation, or having obtained a commutation, affected his ability to be granted parole, Scott could resurrect his habeas claim as to the attempted murder convictions.  Id.  For this reason, the court directed that Scott's habeas petition should be dismissed *without* prejudice as to this claim.  Id.

In United States v. Ross, 801 F.3d 374, 375-76 (3d Cir. 2015), the court addressed Ross' § 2255 motion challenging his conviction for possession of a machinegun in violation of 18 U.S.C. § 922(o).  Specifically, Ross argued that his counsel had been constitutionally ineffective by failing to argue that the government introduced insufficient evidence to convict him of the machinegun count; he also argued counsel failed to argue for a jury instruction that would have required the jury to find Ross knew the characteristics of the firearm he possessed brought it within the definition of "machinegun" under the law.  Id. at 377.  At trial, Ross had been convicted of a drug crime for which a mandatory minimum term of incarceration of 10 years was required, the machinegun count, and six other counts.  Id. at 376-77.  The district court sentenced Ross to 10 years' imprisonment for each of the seven convictions, including the machinegun count, each such sentence to run concurrently with the others.  Id.  On the eighth conviction, the court imposed a mandatory consecutive sentence of 30 years' imprisonment, thus bringing Ross' total term of imprisonment to 40 years.  Id.

The court noted that Ross' conviction under § 922(o) may very well have been unlawful, an issue he might have won had he raised it on direct appeal. Id. at 378-79.  However, under § 2255, a different standard of review applied. Id.  The court noted § 2255 provided relief for "a prisoner *in custody* under a sentence of a [federal] court . . . *claiming the right to be released* upon the ground" that his sentence was unlawful.  Id. at 378 (emphasis in original). Even if the machinegun conviction was unlawful, Ross was serving six other 10-year sentences concurrently plus the 30-year sentence consecutively—thus, he could not "claim the right to be released" as stated in § 2255 even if he were successful on his motion as to the machinegun count.  Id. at 379-82.  The court specifically rejected Ross' argument that the separate special assessment of $100 on his machinegun conviction was enough to create a case or controversy as to his § 2255 motion, even if he could not be released.  Id.  Ross could not point to any other collateral consequence of his machinegun conviction such that his § 2255 motion would provide the court with a live controversy.  Id. at 382-83.  See also Parkin v. United States, 565 Fed. Appx. 149, 152-53 (3d Cir. 2014) (where habeas petitioner presented a challenge to only one conviction for which he was serving 60 months, and a second conviction for which he was serving a 90-month concurrent sentence was not called into question, court would not rule on the merits of the challenge to the 60-month conviction because it would not result in petitioner's release even if successful); Barnes v. United States, 230 F.3d 1362, 2000 WL 889838 (8th Cir 2000) (unpub'd) (affirming district court's application of concurrent sentence

doctrine where alleged ineffective assistance claims as to one conviction would not reduce Barnes' life sentence he was serving in connection with a different conviction).

The validity of the concurrent sentence doctrine has come into question in direct appeals.  See e.g. United States v. Bass, 794 F.2d 1305, 1311 (8th Cir. 1986).  The Supreme Court held in the context of a direct appeal, the mere assessment of a "special assessment" on each separate conviction renders ostensibly concurrent sentences not in fact concurrent.  Ray v. United States, 481 U.S. 736, 736-37 (1987) (per curiam).  In effect, the Court has held that a special assessment is enough of an adverse collateral consequence to render the doctrine inapplicable.  Id.  Thus, in a direct appeal, a court should not apply the concurrent sentence doctrine and should address all of a defendant's challenges to each of his convictions.  Id.

However, such is not the case on federal habeas, where the doctrine remains robust.  That is because § 2255 authorizes relief only where a prisoner can make a claim to the *right to be released* due to a defect in his sentence or conviction.  See 28 U.S.C. § 2255(a).  Clearly, in the case of concurrent sentences where at least one sentence/conviction has been upheld, the prisoner cannot claim a right to be released if a second sentence/conviction is for some reason invalid.  In re Williams, 826 F.3d at 1356-57; Ross, 801 F.3d at 378; Parkin, 565 Fed. Appx. at 152-53; Barnes, 230 F.3d 1362; Scott, 934 F.2d at 634-35; and Neff, 525 F.2d at 362-63.  The concurrent sentence doctrine is a matter of the court's discretion; it is not mandatory that it be

45

applied even where circumstances are appropriate.  See United States v. Smith, 601 F.2d 972, 973 (8th Cir. 1979).

Based on the foregoing, and based on this court's conclusion that the conviction and life sentence for Count 5 involving L.O. stand, discretion exists to decline to rule on the merits of Mr. Campbell's claims as to the convictions stemming from his life sentences in Counts 1 (M.A.) and 3 (N.K.) of the indictment, as well as the convictions for Counts 2 and 4 for which a term of 20 years was given as to each.  This court respectfully recommends that the discretion to apply the concurrent sentence doctrine be exercised and that, having affirmed the conviction as to Count 5, Mr. Campbell's claims as to the other counts of conviction not be reviewed on their merits.

Should the district court disagree, this magistrate judge stands ready, willing and able to address the 16 other allegations of ineffective assistance of counsel and will do so if this matter is remanded for such analysis and reporting.

**ORDER**

Mr. Campbell's motion to amend his § 2255 motion by adding a Batson claim [Docket No. 22] is hereby GRANTED.

**RECOMMENDED DISPOSITION**

Based on the foregoing law, facts, and analysis, this magistrate judge respectfully recommends GRANTING the government's motion to dismiss [Docket No. 30].  Dismissal of Mr. Campbell's motion is recommended to be without prejudice in the event he can, at some future time, demonstrate an

adverse collateral consequence stemming from one of his four other convictions.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED January 23, 2017.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge

47